Christyne M. Martens, WSB #7-5044
Assistant United States Attorney
District of Wyoming
P.O. Box 22211
Casper, WY 82602
307-261-5434 (phone)
307-261-5471 (fax)
christyne.martens@usdoj.gov

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF WYOMING

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | |
| Plaintiff, | |
| v. | Case No. 23-CR-95-SWS |
| **PETER SZANTO,** | |
| Defendant. | |

### Government's Response in Opposition to
### Defendant's Motion to Suppress the F.B.I. Interview [ECF No. 90]

This Court should deny the Defendant's motion because he did not clearly and unequivocally invoke his right to counsel and his resulting statements were voluntary.

**I.     Introduction and Factual Background**

On July 19, 2023, a grand jury for the District of Wyoming returned a three-count *Indictment* charging the Defendant with making a false statement in connection with a bankruptcy proceeding, in violation of 18 U.S.C. § 152(2) (Count One); executing a bankruptcy fraud scheme, in violation of 18 U.S.C. § 157 (Count Two); and falsifying records in a bankruptcy, in violation of 18 U.S.C. § 1519 (Count Three). (ECF No. 1.) Trial is scheduled to commence April 1, 2024. (ECF No. 63.)

The government anticipates presenting evidence showing that on the morning of August 8, 2023, at approximately 6:30am, FBI Special Agent Amanda Fritz and Special Agent Zachary Burgett arrested the Defendant at his former home, 11 Shore Pine Drive, Newport Beach, California. Agents recorded their interview with the Defendant. (ECF No. 90, Def. Ex. A). Agents began the interview by reading the Defendant his *Miranda* rights from an Advice of Rights form, a copy of which was also provided to the Defendant. *Ex. 1* at 2 (Tr. of Interview); *Ex. 2* (Bates No. 19836, provided Nov. 1, 2023). The Defendant acknowledged he understood his right to remain silent, that his statements would be used against him, and that he could speak to a lawyer. (*Ex. 1* at 2). When agents asked him whether he understood his rights, he replied, "Well, I understand what you said." (*Id*. at 2–3). The Defendant tried to ask agents questions, but the agents interrupted him to try and make sure he understood his rights:

> SPECIAL AGENT BURGETT: I was just making sure that what she said made sense.
>
> MR. SZANTO: Yeah, yeah.
>
> SPECIAL AGENT BURGETT: Okay.
>
> SPECIAL AGENT FRITZ: Okay? Take your time. Read through them again. If you understand them, do you mind initialing behind -- by each line, just that you understand?
>
> MR. SZANTO: All right. I mean, can you tell me what this is about or --
>
> SPECIAL AGENT FRITZ: What this is -- what this is about is it's about some bankruptcy fraud allegations concerning a bankruptcy petition you filed in Wyoming.
>
> MR. SZANTO: I didn't file Wy- -- Wyoming bankruptcy.
>
> SPECIAL AGENT FRITZ: Let's first get through this and then we can talk. Okay?
>
> MR. SZANTO: Sure.
>
> SPECIAL AGENT FRITZ: Okay. I just want to make sure you understand these so we can go forward.

> MR. SZANTO: Bankruptcy petition in Wyoming?
>
> SPECIAL AGENT FRITZ: Yes, sir.

(*Id*. at 3–4). The Defendant then said, "I mean, I – I – I think I would like a lawyer. . . . I don't have anybody to call." (*Id*. at 4). Realizing she had not read the waiver provision of the Advice of Rights form, SA Fritz then finished reading the Advice of Rights form, concluding with "So it's up to you. If you want to talk to us, we're here to get your side of the story and see what you have to say. If you want your lawyer, that is your right and you can do that . . . as well." (*Id*.). The Defendant responded:

> MR. SZANTO: -- I don't have a lawyer.
>
> SPECIAL AGENT FRITZ: So do you want to talk to us?
>
> MR. SZANTO: Well, I'm -- I'm anxious to see what you've got to say --
>
> SPECIAL AGENT FRITZ: Okay.
>
> MR. SZANTO: -- certainly.
>
> SPECIAL AGENT FRITZ: Okay. Then I need you to sign basically saying, again, you have read the statement of rights and I understand what my rights are and at this time I am willing to answer any questions without a lawyer present.

(*Id*. at 4-5). SA Burgett then confirmed that the Defendant had a law degree and understood his *Miranda* rights. (*Id*. at 5). There was some back and forth about the import of the form and then SA Burgett asked, "So Peter, is it – is it safe to say that you understand your rights but you're just refusing to sign?" (*Id*. at 8). The Defendant sidestepped the attempt to clarify his wishes, and SA Fritz said:

> SPECIAL AGENT FRITZ: Okay. Well, we're not trying to stump you. We're really right now just trying to make sure you understand your rights.
>
> MR. SZANTO: I -- I -- I understand my rights.
>
> SPECIAL AGENT FRITZ: Okay.
>
> MR. SZANTO: And I think I would like to have a lawyer here.

3

SPECIAL AGENT FRITZ: Okay.

MR. SZANTO: I -- I --

SPECIAL AGENT FRITZ: That's fine. This is your -- your chance to talk to us. And if you want to talk to your lawyer first, it's totally fine.

MR. SZANTO: I mean, do -- do you want to give me a hint as to what -- what you've got on your mind or --

SPECIAL AGENT FRITZ: Well, I mean, we'll talk to you if you're willing to talk. If you're not willing to talk, we're not -- we're not going to ask you questions.

MR. SZANTO: I mean, I'm -- I'm searching my head as to --

SPECIAL AGENT FRITZ: And that's fine. Like I said --

MR. SZANTO: A bankruptcy --

SPECIAL AGENT FRITZ: You want to speak to --

MR. SZANTO: -- petition in Wyoming.

SPECIAL AGENT FRITZ: That's correct.

MR. SZANTO: Have -- have -- is there an accusation that I've been to Wyoming?

SPECIAL AGENT FRITZ: Not that you've been there, but that a petition has been filed, yes.

MR. SZANTO: By me?

SPECIAL AGENT FRITZ: Yes.

MR. SZANTO: Signed by me?

SPECIAL AGENT FRITZ: Yes.

MR. SZANTO: Really? That doesn't -- doesn't ring a bell. I'm sorry.

SPECIAL AGENT FRITZ: Okay. Do you at least want to sign that you consent your rights and we just won't ask you questions?

MR. SZANTO: I mean, I -- I honestly don't know what to do.

(*Id*. at 8–10). The government anticipates that it will present testimony that a brief exchange between SA Fritz and SA Burgett occurred at this point in which they confirmed with each other

4

that they believed that the Defendant understood his rights. Then, SA Fritz again tried to confirm the Defendant's understanding and his wishes:

> SPECIAL AGENT FRITZ: Well, understand that -- you understand your rights; correct?
>
> MR. SZANTO: I -- I --
>
> SPECIAL AGENT FRITZ: Okay.
>
> MR. SZANTO: I -- I understand what you've said.
>
> SPECIAL AGENT FRITZ: Okay.
>
> MR. SZANTO: I think I do.
>
> SPECIAL AGENT FRITZ: Okay. Do you want your attorney?
>
> MR. SZANTO: I don't have an attorney.
>
> SPECIAL AGENT FRITZ: Okay. Then are you going to answer our -- some of our questions here?
>
> MR. SZANTO: I -- I'm happy to listen --
>
> SPECIAL AGENT FRITZ: Okay.
>
> MR. SZANTO: -- to what you've got to say, please.

(*Id*. at 10–11). SA Fritz then spent the rest of the interview questioning the Defendant.

## II. The Defendant's Fifth and Sixth Amendment rights were not violated.

Interpreting the rights provided by the Fifth Amendment in *Miranda v. Arizona*, the Supreme Court held:

> If the individual states that he wants an attorney, the interrogation must cease until an attorney is present. At that time, the individual must have an opportunity to confer with the attorney and to have him present during any subsequent questioning. If the individual cannot obtain an attorney and he indicates that he wants one before speaking to police, they must respect his decision to remain silent.

*Miranda v. Arizona*, 384 U.S. 436, 474 (1966). Thus, *Miranda* established a two-part analysis for determining when the prescribed procedural safeguards must be provided: (1) the individual must

5

be in custody, and (2) the individual must be subjected to questioning that meets the legal definition of interrogation. *United States v. Perdue*, 8 F.3d 1455, 1463 (10th Cir. 1993).

In *Edwards v. Arizona*, the Supreme Court expanded on *Miranda*, holding that when a defendant is subjected to custodial interrogation, and the defendant expressly invokes his right to counsel, that individual is "not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." *Edwards v. Arizona*, 451 U.S. 477, 484–85 (1981). And protecting that right further, no subsequent interrogation my occur until counsel is present. *Minnick v. Mississippi*, 498 U.S. 146, 153 (1990). Here, the Defendant was arrested and handcuffed when he was questioned by FBI special agents. Therefore, the Fifth Amendment protections outlined by *Miranda* and its progeny applied.

At the time he was questioned, he had also been indicted by a federal grand jury. When a defendant is indicted, the Sixth Amendment right to counsel attaches. *Fellers v. United States*, 540 U.S. 519, 523 (2004). Therefore, the FBI interview of the Defendant implicated both his Fifth and Sixth Amendment rights.

Analysis of both rights uses the same standard to determine whether or not the police may question a suspect. *Montejo v. Louisiana*, 556 U.S. 778, 794–97 (2009) (overruling *Michigan v. Jackson*, 475 U.S. 625, (1986)). In *Montejo*, the Supreme Court held that the protections outlined by *Miranda¸ Edwards*, and *Minnik* were sufficient to protect the Sixth Amendment right to counsel. *Id*. at 794–95. It was immaterial that the right to counsel during a custodial interrogation was protected by two sources of law—the Fifth and Sixth Amendment—because the "doctrines ensuring voluntariness of the Fifth Amendment waiver simultaneously ensure the voluntariness of the Sixth Amendment waiver." *Id*. at 795. Adopting this same standard has the benefit of providing

6

clear direction to law enforcement and relying on the clear law regarding "which sorts of statements trigger it's protections." *Id*. at 796–97 (citing *Davis v. United States*, 512 U.S. 452, 459 (1994)).

### A. The Defendant did not clearly and unequivocally invoke his right to counsel.

To trigger *Edwards* and *Minnick* a defendant must make "some statement that can reasonably be construed to be expression of a desire for the assistance of an attorney *in dealing with custodial interrogation by the police*." *McNeil v. Wisconsin,* 501 U.S. 171, 178 (1991) (emphasis in original). Requests for counsel must not be "ambiguous or equivocal." *Davis v. United States*, 512 U.S. 452, 459 (1994). "If a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect might be invoking the right to counsel, our precedents do not require the cessation of questioning." *Id*. When faced with an ambiguous reference to an attorney, officers are not required to ask clarifying questions to discern the defendant's intentions. *Id.* at 461-62. An "objective inquiry" is employed to determine whether an accused has actually invoked his rights under *Miranda*. *Id.* at 459.

The Tenth Circuit has repeatedly declined to find that ambiguous references to attorneys qualified as invocations of the right to counsel. *See, e.g., United States v. DeVargas*, 64 F.4th 1148, 1163 (10th Cir. 2023) ("I have a lawyer on this case" taken in context was not an unequivocal request for counsel); *United States v. Zamora*, 222 F.3d 756, 765 (10th Cir. 2000) (holding that "I might want to talk to my attorney" was ambiguous, so it did not invoke right to counsel). In *United States v. Lux*, 905 F.2d 1379, 1382 (10th Cir. 1990), the Tenth Circuit affirmed a district court finding that a defendant did not make an unambiguous request for counsel when she asked "how long it would take" if she wanted a lawyer and if she "would have to stay in jail" while she waited.

7

*See Valdez v. Ward*, 219 F.3d 1222, 1232–33 (10th Cir. 2000) (holding that a non-native English speaker's statement, in response to whether he understood his *Miranda* rights, that "Yes, I understand a little bit and I sign it because I understand something about a lawyer and he want to ask me questions and that's what I'm looking for a lawyer" [sic] was an ambiguous request for counsel); *Mitchell v. Gibson*, 262 F.3d 1036, 1056 (10th Cir. 2001) ("Even construed most favorably to Mr. Mitchell, his statement asking police whether he needed an attorney is not, in light of the circumstances, a sufficiently clear request for counsel."); *United States v. Nelson*, 450 F.3d 1201, 1212 (10th Cir. 2006) ("I guess I'm ready to go to jail then" was an ambiguous statement). To invoke the right to counsel or remain silent, the statement must be clear. *United States v. Sierra-Estrada*, 248 Fed. Appx. 973, 981 (10th Cir. 2007).

Here, the Defendant's reference to his attorney was not a clear and unequivocal invocation of his right to counsel. In the dialogue outlined above, he did no more than express that he might want a lawyer by saying "I think I would like a lawyer" and "I think I would like to have a lawyer here." (*Ex. 1* at 4, 9). These are precisely the kinds of equivocations that are insufficient to require agents to cease questioning. *See Zamora*, 222 F.3d at 765. And even though they were not required to attempt to clarify, agents repeatedly attempted to clarify the Defendant's desires. *Davis,* at 512 U.S. at 461–62. The Defendant met these clarifying questions by declaring that he did not have a lawyer, which also was not an unequivocal invocation of his right to counsel. (*Ex. 1* at 4, 11). And he repeatedly said he was not sure what he wanted to do. (*Id*. at 7, 10). And each exchange ended with the Defendant asking the agents to tell him what they knew by saying things like "can you tell me what this is about," "I'm anxious to see what you have to say," "do you want to give me a hint as to what [] you've got on your mind?" and "I'm happy to listen . . . to what you've got to

say, please." (*Ex. 1* at 3, 4, 9, 11). A reasonable officer would interpret the Defendant's behavior as wishing to speak with law enforcement.

"If an ambiguous act, omission, or statement could require police to end the interrogation, police would be required to make difficult decisions about an accused's unclear intent and face the consequence of suppression 'if they guess wrong.'" *Berghuis v. Thompkins*, 560 U.S. 370, 382 (2010) (quoting *Davis*, 512 U.S. at 461). "Suppression of a voluntary confession in these circumstances would place a significant burden on society's interest in prosecuting criminal activity." *Berghuis,* 560 U.S. at 382.

Because the Defendant did not invoke his right to counsel, there was nothing preventing officers from questioning him further. And even if he was subjectively making an attempt to invoke his right, his statement was not sufficiently clear to require that officers abstain from questioning him.

### B.     The Defendant's statement was voluntary.

The Defendant does not suggest that he was coerced into speaking with agents. Nor does he claim that he did not understand his rights. Instead, he argues that because he never signed the advice of rights form or clearly said he affirmatively wished to speak with agents, he never knowingly and intelligently waived his rights. (ECF No. 90 at 7–9).

However, a defendant may waive his right against self-incrimination by choosing to speak with law enforcement. An implicit waiver can be "inferred from the defendant's actions and words." *United States v. Toro-Pelaez*, 107 F.3d 819, 825 (10th Cir. 1997) (citing *North Carolina v. Butler*, 441 U.S. 369, 373 (1979)); *see also Berghuis v. Thompkins*, 560 U.S. 370, 384 (2010) ("An implicit waiver of the right to remain silent is sufficient to admit a suspect's statement into evidence." (internal quotation marks omitted)). By making an uncoerced statement to the police,

"a suspect who has received and understood the *Miranda* warnings, and has not invoked his *Miranda* rights, waives the right to remain silent[.]" *Berghuis*, 560 U.S. at 388.

When determining whether a waiver is voluntary, knowing, and intelligent, a court should examine the totality of the circumstances to determine whether the choices was uncoerced and made with comprehension. *United States v. Burson*, 531 F.3d 1254, 1256–57 (10th Cir. 2008). Here, the Defendant acknowledged that he has a law degree and fully understood his rights. (*Ex. 1* at 2–3, 5–6, 9, 11). He does not argue that he did not comprehend his rights. (ECF No. 90 at 6–9). Instead, he suggests only that he was overwhelmed by the surprise of federal agents in his home. (*Id*. at 9). But even if that caused him some emotional stress, that does not render his choice to speak to agents involuntary. For such factors to render a statement involuntary, the Defendant must show he was substantially impaired. *Burson*, 531 F.3d at 1257. For example, the Tenth Circuit held that a statement was voluntary where the defendant was in the hospital recovering from a gunshot wound, under the influence of medication, and the posttraumatic stress of being shot in the back. *United States v. Morris*, 287 F.3d 985, 989 (10th Cir. 2002). The circumstances here were nothing like *Morris*. Defendant may have been a bit unsettled, but he was fully capable of making a voluntary choice to speak with law enforcement.

### III. CONCLUSION

The Defendant's ambiguous reference to an attorney did not prevent officers from questioning him after proper *Miranda* warnings. Having chosen to speak, he did so voluntarily.

The Defendant's motion should be denied.

**DATED** this 4th day of March 2024.

            Respectfully submitted,

            NICHOLAS VASSALLO
            United States Attorney

By: */s/ Christyne M. Martens*
   CHRISTYNE M. MARTENS
   Assistant United States Attorney

### CERTIFICATE OF SERVICE

This is to certify that on the 4th day of March 2024, I served a true and correct copy of the foregoing document upon counsel of record for the Defendant via CM/ECF.

            */s/ Hunter J. Davila*
            UNITED STATES ATTORNEY'S OFFICE